UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REID HOSPITAL & HEALTH CARE SERVICES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| vs. | ) No. 1:17-cv-01422-LJM-TAB ) ) |
| CONIFER HEALTH SOLUTIONS, LLC, and CONIFER REVENUE CYCLE SOLUTIONS, LLC, | ) ) ) ) ) |
| Defendants. | ) |

## ORDER ON DEFENDANTS' MOTION TO DISMISS

This matter is before the Court on Defendants', Conifer Health Solutions, LLC and Conifer Revenue Cycle Solutions, LLC (collectively "Conifer's"), Motion to Dismiss. Dkt. 26. Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), Conifer moves to dismiss three counts of Plaintiff's, Reid Hospital & Health Care Services, Inc. ("Reid's"), Amended Complaint. Dkt. 8. For the reasons set forth below, Conifer's Motion to Dismiss is **GRANTED**.

## I. BACKGROUND

Reid is an Indiana not-for-profit corporation that operates a hospital in Wayne County, Indiana. Dkt. 8, ¶ 1. Reid manages a 233-bed regional referral center and is in the business of providing healthcare and hospital services. Dkt. 8, ¶ 2.

Conifer provides comprehensive revenue cycle management and collection services to hospitals and other healthcare providers. Dkt. 8, ¶ 9. Conifer holds itself out

as the number one hospital revenue cycle management and collection outsourcing vendor. Dkt. 8, ¶ 10.

On April 28, 2011, Reid outsourced its entire revenue cycle management to Dell Marketing, LP ("Dell"), pursuant to a 77-page Master Agreement for Revenue Cycle Outsourcing (the "Agreement"). Dkt. 8, ¶ 21.[1] Section 18.10 of the Agreement provides that it "shall be governed according to the laws of Indiana without giving effect to any rule or conflicts of law." Dkt. 8, ¶ 22.

On November 5, 2012, Conifer assumed all of Dell's duties and obligations under the Agreement, which made it responsible for Reid's entire revenue cycle management. Dkt. 8, ¶¶ 23, 24. Specifically, Conifer was responsible for the following: prequalifying patients, case management services, accurate coding, medical records, timely billing for Reid's services, timely responding to requests for additional information from third party payors (i.e. insurers, Medicaid, and Medicare), timely appealing and pursuing denials, and, ultimately, collecting all sums due Reid for its services. Dkt. 8, ¶ 26.

Section 12.4 of the Agreement states that Conifer "[w]arrants that the service shall be performed in a manner consistent with best practices of providers of the types of services specified in this Agreement." Dkt. 8, ¶ 27. In Section 1.1 of the Agreement, Conifer represented that it "has the skill, personnel, knowledge and management expertise to provide the services in compliance with all applicable laws and payor contracts." Dkt. 8, ¶ 28.

---

[1] Neither party attached the Agreement to their briefs, so the Court will accept the sections of the Agreement cited by Reid in its Amended Complaint.

2

Section 10.1(B) of the Agreement states: "<u>Incentive Fees</u>. Commencing with the Second Contract Year of the Term … Conifer will deliver an invoice to Reid for the incentive fees, if any, earned by Conifer during the prior Measurement Period. … Reid will pay each such invoice in accordance with Section 10.5." Dkt. 8, ¶ 32. The Agreement also specified "that except with the express written consent of Reid, all Base Service functions shall be performed at a facility that is located within a 20 mile radius of the address of Reid's offices stated in the opening paragraph of this Agreement." (hereinafter "Locality Clause"). Dkt. 8, ¶ 33.

Section 14.1(B) of the Agreement is titled "Limitation of Liability" and states, in relevant part:

> "<u>Limitation on Types of Damages</u>. Except with respect to claims resulting from the willful misconduct of [Conifer], its employees and agents, breach by [Conifer], its employees or agents of its confidentiality obligations under <u>Section 11.2</u> or (iii) claims from [Conifer's] indemnification obligations and <u>Section 20</u> of **Schedule E**, but with respect to all other claims, actions and causes of action arising out of, under or in connection with this Agreement (except for Reid's obligations to make payments under this Agreement), regardless of the form of action, whether in contract or tort (including negligence, strict liability or otherwise) and whether or not such damages are foreseen, neither Party will be liable for, any amounts for indirect, incident[al], special, consequential (including without limitation, loss profits, lost revenue, or damages for the loss of data) or punitive damages of the other Party or any third parties.

Dkt. 8, ¶ 35 (some modification in original; some by the Court).

Section 14.1(C) of the Agreement further provides, in relevant part:

> <u>Limitation on Direct Damages</u>. Except with respect to Reid's payment obligations under this Agreement and with respect to claims, actions or causes of action arising from (1) [sic] [Conifer's] indemnification obligations set forth in <u>Article 13</u>, (ii) the willful misconduct or Gross Negligence of [Conifer], its employees and agents, (iii) a breach by [Conifer], its employees or agents of its obligation of confidentiality <u>Section 11.2</u>, or (iv) claims from [Conifer's] indemnification obligations set forth in <u>Section 20</u> of **Schedule E**, but with respect to all other claims, actions and causes of

> action arising out of, under or in connection with this Agreement, regardless of the form of action, whether in contract or tort (including negligence, strict liability or otherwise) and whether or not such damages are foreseen, neither party's liability will exceed the total amount actually paid or payable to [Conifer] by Reid for Services provided under this Agreement (excluding amounts paid as reimbursement of expenses or taxes) during the 12 month period immediately preceding the date on which the claim, action, or cause of action arose.

Dkt. 8, ¶ 36 (modification in original).

In August 2012, shortly before Conifer assumed responsibility under the Agreement from Dell, Dell submitted a survey to its employees working on the Reid project, which revealed staffing shortages at Reid in the revenue cycle management operations managed by Dell. Dkt. 8, ¶¶ 40-41. The results of the survey were known by Conifer at the time it assumed Dell's responsibilities under the Agreement. Dkt. 8, ¶ 43. The director of Dell's work under the Agreement, Matt Mason, became the director of Conifer's work under the Agreement as well. Dkt. 8, ¶ 44.

In December 2012, frequent unaddressed staffing shortages began to occur and were reflected in Conifer staff emails. Dkt. 8, ¶ 46. The understaffing continued to worsen under Conifer's management of Reid's revenue cycle operations. Dkt. 8, ¶¶ 47-48.

At some point, Conifer requested that Reid waive the Locality Clause, claiming that Conifer could improve performance if it could manage Reid's revenue cycle from its offices in Dallas, Texas, but Reid refused. Dkt. 8, ¶ 50. Conifer did not disclose to Reid that it was cutting staff to hold down costs. Dkt. 8, ¶ 50.

In the months after Conifer assumed the Agreement, Reid became aware that Conifer failed to meet the minimum performance standard classified as "Point of Service Collection" during the July to September 2012, measurement period as well as during the January to March 2013, measurement period. Dkt. 8, ¶ 51. On September 9, 2013, Craig

Kinyon, President and CEO of Reid, wrote a letter to Conifer expressing concerns with Conifer's failure to meet various performance metrics. Dkt. 8, ¶ 53. Kinyon wrote that "[t]he failure to meet Conifer's minimum performance standards is likely the result of Conifer's reduction of staff and the failure to perform all the base services delegated to Conifer under the Master Agreement." Dkt. 8, ¶ 54.

The Case Management Director on the Reid project left Conifer on September 20, 2013. Dkt. 8, ¶ 60.

On October 11, 2013, Conifer's Assistant Vice President of Client Management, Sean Kirby, responded to the numerous issues that Kinyon identified, and conceded that Conifer was "facing some staffing changes and challenges." Dkt. 8, ¶ 55. At the time of Kirby's response, Connifer had reduced its health information management and business office staff on the Reid project by 13 and 15 full-time employees, respectively. Dkt. 8, ¶¶ 57-58. Moreover, Conifer had reduced the patient access staff on the Reid project by 2 full-time employees since the Dell transition. Dkt. 8, ¶ 59. Kirby knew of these staff reductions but removed them from an early draft of his response to Kinyon at the suggestion of Conifer's on-site Director of Revenue Cycle Management, Laura Hale. Dkt. 8, ¶ 61. Hale suggested that Kirby withhold this information from Reid to prevent it from discovering the extreme staffing shortages caused by Conifer. Dkt. 8, ¶ 62. Accordingly, this information was omitted by Kirby in his response. Dkt. 8, ¶ 63.

To address Reid's concerns, Kirby committed Conifer to "[c]omplete recruitment for open positions" and "[o]nboard additional remote/local resources" within 90 days of the letter. Dkt. 8, ¶ 64. Despite this assurance, the problems caused by Conifer's short

staffing the Reid revenue cycle management and collection processes did not improve. Dkt. 8, ¶ 66-73.

In April 2014, Conifer once again sought to eliminate the Locality Clause in order to improve delivery of Conifer's services. Dkt. 8, ¶ 77. Also in April 2014, Conifer sent a "Value Proposition" to Reid, which sought to alter the Agreement and proposed that Conifer: (1) receive the same pay annually; (2) no longer provide revenue cycle services to Reid; (3) increase the amount it would charge Reid for patient registration expenses; (4) eliminate annual contractual decreases so that it could bill Reid more; and (5) assume more expense by filling critical open positions. Dkt. 8, ¶ 79-84. Conifer informed Reid that Reid was spending between $4.5 million and $7.5 million less than the typical industry price for revenue cycle outsourcing. Dkt. 8, ¶ 86. Conifer did not, however, tell Reid that Conifer was losing money on the Agreement. Dkt. 8, ¶ 87.

By September 2014, Conifer had cut its staff performing revenue cycle and collection functions at Reid to 105 employees; at the time Reid filed its Amended Complaint, Reid had 218 employees performing the same revenue cycle functions Conifer was contractually obligated to fulfill under the Agreement. Dkt. 8, ¶ 91.

Conifer's understaffing of the Reid project caused Reid to miss various deadlines and failed to satisfy requirements of third party payors, resulting in more than $20 million of Reid's charges for services to be written off. Dkt. 8, ¶¶ 92-98.

On September 30, 2014, Reid terminated Conifer. Following Conifer's termination, Reid hired PricewaterhouseCoopers ("PWC") to attempt to collect as much of Reid's revenues as possible and to investigate the cash posting left undone by Conifer. Dkt. 8, ¶ 100.

After Conifer's departure, Reid immediately discovered that the coding of medical records had been mismanaged as the result of understaffing and inadequate training. Dkt. 8, ¶ 110. Also, Reid uncovered that the master patient index and physician master index systems had printed out thousands of error notices, but instead of correcting the errors, Conifer manager Roscoe Myrmingos simply asked that the error report function be disabled. Dkt. 8, ¶¶ 111-12. Although Reid refused to turn off this function and instructed Myrmingos to correct the errors, countless error reports remained without review or correction by Conifer employees. Dkt. 8, ¶¶ 113-14.

Before PWC commenced working for Reid, Reid put Conifer on notice that it retained PWC and requested any comments or suggestions relating to PWC's proposed activities, but did not receive any statement from Conifer. Dkt. 8, ¶¶ 102-03.

By the time that Reid terminated Conifer: (1) there was a "Discharged Not Final Billed" metric of over $62 million; (2) there was a backlog of cash posting of approximately $33 million; and (3) there was approximately $35 million in net uncollected accounts receivables. Dkt. 8, ¶ 105.

Reid also retained Crowe Horwath LLP ("Crowe"), to investigate Conifer's poor performance and compare Conifer's management of Reid's revenue cycle with best industry practices. Dkt. 8, ¶ 131. Crowe developed a tool that aggregates accounting data from over 600 hospitals to develop performance benchmarks for various categories of hospital revenue cycle management operations ("Industry Benchmarks"). Dkt. 8, ¶ 130. The tool uncovered that various aspects under Conifer's management were far from reaching the Industry Benchmarks. *See* Dkt. 8, ¶¶ 132-39. Moreover, it was discovered

that Conifer failed to perform numerous services for which it was obligated under the Agreement. Dkt. 8, 144-50.

On September 8, 2016, Reid and Conifer entered into a Tolling Agreement, which tolled all limitations periods related to Reid's claims. Dkt. 8, ¶¶ 38-39; Dkt. 8-1.

## II. **STANDARD**

Rule 12(b)(6) permits the dismissal of an action for failure to state a claim upon which relief can be granted in the pleadings. Under Rule 12(b)(6), the Court must accept as true all well-pled factual allegations and draw all reasonable inferences in favor of the plaintiff. *See Esekiel v. Michel*, 66 F.3d 894, 897 (7th Cir. 1995). A pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Detailed factual allegations are not required, but a plaintiff's complaint may not simply state "an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atlantic Corp. v. Twombly*, 550, U.S. 544, 555 (2007). "[A] complaint must contain sufficient factual matter … to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged[,]" not when the plaintiff only raises a "sheer possibility that the defendant has acted unlawfully." *Id*. "[T]he height of the pleading requirement is relative to the circumstances[,]" *Cooney v. Rossiter*, 583 F.3d 967, 971 (7th Cir. 2009), and "[d]etermining the plausibility of a claim is a context-specific task that requires [the Court]

8

to draw on [its] judicial experience and common sense." *Brown v. JP Morgan Chase Bank*, 334 Fed. Appx. 758, 759 (7th Cir. 2009).

When sitting in diversity, as is the case here, the Court must "ascertain the substantive content of state law as it either has been determined by the highest court of the state or as it would be by that court if the present case were before it now." *Thomas v. H&R Block E. Enters., Inc.*, 630 F.3d 659, 663 (7th Cir. 2011). Therefore, Indiana contract law applies to the facts in this case.

### III. DISCUSSION

#### A. PUNITIVE DAMAGES

Conifer first moves to dismiss Reid's claim for punitive damages. In Count Four, Reid seeks to recover punitive damages for Conifer's alleged failure to perform under the Agreement and contends that Conifer "acted intentionally, willfully, coercively, recklessly, and with gross negligence." Dkt. 8, ¶ 202. Reid also claims that Conifer failed to perform under the Agreement by "intentionally understaff[ing]" and "intentionally fail[ing] to implement a claim denial management program." Dkt. 8, ¶¶ 191-92. Reid claims that it has adequately pled the elements of independent torts, which supports an award for punitive damages. Dkt. 34 at 13-16.

Punitive damages are only permitted when "there is clear and convincing evidence that the defendant acted with malice, fraud, gross negligence, or oppressiveness which was not the result of a mistake of fact or law, honest error or judgment, overzealousness, mere negligence, or other human failing." *Wohlwend v. Edwards*, 796 N.E.2d 781, 784 (Ind. Ct. App. 2003). It is well-established, however, that "Indiana follows the rule of no punitive damages in contract cases, unless the claimant pleads and proves the existence

9

of an independent *tort* of the kind for which Indiana law recognizes that punitive damages may be awarded." *Andres v. Mor/Ryde Int'l, Inc.*, 10 N.E.3d 502, 505 (Ind. 2014) (emphasis in original; internal quotations and citations omitted). "'Bad faith' breach of a contract will not support punitive damages unless there is a 'special relationship' between the parties (such as the sometimes arms-length, sometimes-fiduciary relationship between an insurer and its insured) 'to support imposition of a tort duty.'" *Id.* (citing *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 518 (Ind. 1993)). "The rule of law is that a party to a contract or its agent may be liable in tort to the other party for damages from negligence that would be actionable if there were no contract, but not otherwise." *Greg Allen Const. Co. v. Estelle*, 798 N.E.2d 171, 175 (Ind. 2003). Therefore, to plead a tort claim arising from a contractual relationship, "a party must allege, first, that the defendant committed a separate and independent tort, and second, that the tort resulted in an injury distinct from that resulting from the breach of contract." *Forest River Mfg., LLC v. Lexmark Enter. Software, LLC*, No. 3:16-CV-449 JD, 2017 WL 1906164, at *2 (N.D. Ind. May 9, 2017) (citations omitted). "In other words, the question is not whether the plaintiff has pled each element of the tort claim in question, but also whether it has alleged an injury distinct from the breach." *Id.* (citing *Estelle*, 798 N.E.2d at 173).

Reid alleges that Conifer's actions constitute both actual and constructive fraud, which allow for the imposition of punitive damages. "[A] claimant who brings both a breach of contract and a fraud claim must prove that (1) the breaching party committed the separate and independent tort of fraud; and (2) the fraud resulted in injury distinct from that resulting in the breach." *Tobin v. Ruman*, 819 N.E.2d 78, 86 (Ind. Ct. App. 2004). Here, Reid has failed to allege any injury distinct from breach of contract. Reid

first claims that Conifer misrepresented the incentive fees it was owed, which resulted in overpayment by Reid. Dkt. 34 at 15. Reid further asserts that by entering the Agreement it "relinquished significant power over its business operations and gave Conifer the opportunity [to] exploit that power." Dkt. 34 at 15. But this "power" was nothing more than what the two parties agreed to in the Agreement: Reid paid Conifer to run its revenue cycle management and collection operations, which Reid now claims Conifer failed to do as required by the Agreement, nothing more. Similarly, the incentive fees are governed by the Agreement itself and any alleged overpayment may be resolved through Reid's breach of contract claim. Thus, its claims for fraud must fail.

Moreover, Reid fails to allege fraud in its Amended Complaint. Fraud-based claims are subject to the strictures set forth in Rule 9(b), which requires a party to "state with particularity the circumstances constituting fraud or mistake. … [though] [m]alice, intent, knowledge, or other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party asserting a fraud claim must assert "the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs. Inc.*, 536 F.3d 663, 668 (7th Cir. 2008).

Notwithstanding the fact that Reid's Amended Complaint never actually mentions the word "fraud," the Amended Complaint fails to meet this heightened pleading standard as set forth in Rule 9(b). Reid itself concedes that the "Amended Complaint could have organized the allegations that comprise these torts better," Dkt. 34 at 15, but fails to

remedy this failure by pointing to any facts that would support a sufficiently-pled fraud claim.

For these reasons, Reid's claims for punitive damages, pled in Count Four, is **DISMISSED**.

### B.  UNJUST ENRICHMENT

Count Three of the Amended Complaint is for unjust enrichment.  Dkt. 8, ¶¶ 180-88.  Reid asserts that it paid Conifer incentive payments that were miscalculated by Conifer, which resulted in overpayment by Reid of $90,321.00.  Dkt. 8, ¶¶180-83.  Reid claims that it "relied on Conifer's calculations to determine the Incentive Fees it paid Conifer," but that Conifer did not actually earn those payments.  Dkt. 8, ¶ 184-88.  Conifer claims that Reid's unjust enrichment claim must fail because the Agreement between the parties governs any alleged overpayment.  Dkt. 27 at 12.

To state a claim for unjust enrichment, a plaintiff must set forth sufficient facts "that a measurable benefit has been conferred on the defendant under such circumstances that the defendant's retention of that benefit without payment would be unjust." *Zoeller v. E. Chi. Second Century, Inc.*, 904 N.E.2d 213, 220 (Ind. 2009).  However, "[w]hen the rights of parties are controlled by an express contract, recovery cannot be based on a theory implied in law."  *Id.* (quotations omitted).  Thus, "[t]he existence of an express contract precludes an unjust enrichment claim because: (1) the contract provides a remedy at law; and (2) a plaintiff cannot pursue an equitable remedy when there is a remedy at law."  *Entm't USA, Inc. v. Moorehead Commc'ns, Inc.*, 93 F. Supp. 3d 915, 934 (N.D. Ind. 2015).

Reid merely cites two cases for the proposition that payment in excess of what is required by contract may be properly sought in an unjust enrichment/restitution action. Dkt. 34 at 11. Reid quotes, "It is generally recognized in the law of restitution that if one party pays money to another party under a mistake of fact that a contract or other obligation required such payment, the payor is entitled to restitution." *St. Mary's Med. Ctr., Inc. v. United Farm Bureau Family Life Ins. Co.*, 624 N.E.2d 939, 941 (Ind. Ct. App. 1993). But *St. Mary's* did not involve an express contract, as is the case here; *St. Mary's* involved the mistaken payment by an insurer to a hospital on behalf of an insured whose policy had lapsed and therefore no privity of contract existed. *Id*. at 940-41. Similarly, Reid cites to *Community Care Centers, Inc. v. Sullivan*, in which a restitution claim brought by the State of Indiana was allowed to proceed. 701 N.E.2d 1234 (Ind. Ct. App. 1998). But that restitution claim did not involve an express contract as between two parties, it involved payments made under an injunction, and pursuant to federal regulations, *id.* at 1238; therefore, it is not analogous to the instant case. Neither of these cases distinguish the rule that when parties have designated their rights under an express contract, "recovery cannot be based on a theory implied in law," such as unjust enrichment. Accordingly, Count Three of the Amended Complaint for unjust enrichment is **DISMISSED**.

### C. BREACH OF WARRANTY

The Second Count of the Amended Complaint is for breach of warranty. Therein, Reid claims that Conifer expressly warranted in the Agreement that "the services shall be performed in a manner consistent with best practices of providers of the types of services specified in this Master Agreement." Dkt. 8, ¶ 170. And despite this warranty, "Conifer

13

willfully failed and refused to staff the Reid project in a manner that would enable Conifer personnel to exercise Best Industry Practices, thereby breaching the express warranty." Dkt. 8, ¶ 171. Finally, the Agreement stated that should Conifer breach this warranty, "[Conifer] shall supply services to correct or replace the work at no charge." Dkt. 8, ¶ 173. Reid also claims that its damages "cannot be remediated by the provision of additional services." Dkt. 8, ¶ 172.

Conifer argues that the Agreement provided, at most, a limited warranty that included an exclusive remedy to which Reid never availed itself. Dkt. 27 at 15. Moreover, Conifer argues that Reid essentially pled itself out of relief when it claimed that the damages can no longer be remediated by Conifer providing services. Dkt. 27 at 15.

In its brief, Reid acknowledges that it does not have a claim for a breach of contract under the Uniform Commercial Code and that it seeks a remedy for breach of warranty solely under common law principles. Dkt. 34 at 5. Reid fails, however, to explain those principles or demonstrate how a common law breach of warranty claim would differ from its breach of contract claim. In fact, Reid cites to numerous Indiana cases but none of them recognize a common law breach of warranty claim distinct from a breach of contract claim. Reid simply concludes, without any legal support or analysis, that "[g]enerally, an express warranty is akin to a contract. To prevail on a breach of contract claim, and in turn, a common law breach of warranty claim, a plaintiff must show the existence of warranty, a breach of that warranty, and damages." Dkt. 34 at 7 (citing *Insul-Mark Midwest, Inc., v. Modern Materials*, 612 N.E.2d 550, 556-57 (Ind. 1993); *Roche Diagnostic Operations, Inc. v. Marsh Supermarkets, LLC*, 987 N.E.2d 72 (Ind. Ct. App. 2013)). This skeletal argument fails to refute any of Conifer's assertions or provide legal

support for Reid's breach of warranty claim. Accordingly, Reid's breach of warranty claim in Count Two of the Amended Complaint is **DISMISSED**.

## IV. CONCLUSION

For the foregoing reasons, Defendants', Conifer Health Solutions, LLC and Conifer Revenue Cycle Solutions, LLC (collectively "Conifer's"), Motion to Dismiss is **GRANTED**. Dkt. 26. Counts Two (Breach of Express Warranty), Three (Unjust Enrichment), and Four (Gross Negligence and/or Wanton and Willful Misconduct Sufficient to Justify Punitive Damages), of Plaintiff Reid Hospital & Health Care Services, Inc.'s, Amended Complaint are hereby **DISMISSED without PREJUDICE**. Plaintiff shall have fourteen (14) days from the date of this Order to amend its Amended Complaint.

IT IS SO ORDERED this 30th day of August, 2017.

_____
LARRY J. McKINNEY, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Kristen K. Bromberek
ALSTON & BIRD LLP
kristen.bromberek@alston.com

Samuel R. Rutherford
ALSTON & BIRD LLP
sam.rutherford@alston.com

William H. Jordan
ALSTON & BIRD LLP
bill.jordan@alston.com

Mary Kaye Reeder
REID HOSPITAL & HEALTH CARE SERVICES, INC.
Mary.Reeder@reidhealth.org

Raymond D. Faust
STARR AUSTEN & MILLER LLP
faust@starrausten.com

Scott L. Starr
STARR AUSTEN & MILLER LLP
starr@starrausten.com

Patrick A. Shoulders
ZIEMER STAYMAN WEITZEL & SHOULDERS
pshoulders@zsws.com

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com