UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| REID HOSPITAL & HEALTH CARE SERVICES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) No. 1:17-cv-01422-JPH-TAB ) |
| CONIFER REVENUE CYCLE SOLUTIONS, LLC, | ) ) ) ) |
| Defendants. | ) |

**SEALED ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

Reid Hospital contracted with Conifer Revenue Cycle Solutions to help Reid improve its revenue cycle. After twenty-three months, Reid terminated the contract because it believed that Conifer was not fulfilling its obligations. Reid claims that Conifer breached the contract, and both parties have moved for summary judgment. Because the Agreement bars liability for the damages Reid seeks, Conifer's motion is **GRANTED**, dkt. [79], and Reid's motion is **DENIED**, dkt. [94].

## I.
## Facts and Background

Because Conifer has moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to Reid and draws all reasonable inferences in its favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) (citation omitted). Since Reid has also moved for summary judgment, the Court would normally interpret the evidence in a light most favorable to Conifer when considering Reid's motion. *See Am. Family Mut. Ins.*

1

*v. Williams*, 832 F.3d 645, 648 (7th Cir. 2016).  That's not necessary here, however, because when all evidence is interpreted in Reid's favor, Conifer is entitled to summary judgment.

Reid Hospital & Health Care Services, Inc. provides health-care services in East Central Indiana and West Central Ohio.  Dkt. 42 ¶ 2.  Conifer Revenue Cycle Solutions, LLC provides "revenue cycle management and collection services" to hospitals throughout the country.  *Id.* ¶ 9.

In November 2012, Conifer assumed the rights and obligations of a Master Services Agreement for Revenue Cycle Outsourcing (the "Agreement") that Reid had with Dell Marketing L.P.  Dkt. 82-1; dkt 82-3 at 17 (Kenyon Dep. at 121); dkt. 80 at 5; dkt. 95 at 11.  The Agreement required Conifer to provide services including preregistering patients and doing medical coding and billing.  *See* dkt. 82-1.  These services were designed to increase Reid's revenue by increasing collections, improving information management, and eliminating inefficiencies.  Dkt. 82-1 at Schedule A.

The Agreement limited the types of damages for which either party could be liable:

> <u>Limitation on Types of Damages</u>. Except with respect to claims resulting from the willful misconduct of [Conifer or] its employees and agents . . . but with respect to all other claims, actions and causes of action arising out of, under or in connection with this Agreement . . . whether or not such damages are foreseen, neither Party will be liable for, any amounts for indirect, incidental, special, consequential (including without limitation lost profits, lost revenue, or damages for the loss of data) or punitive damages of the other Party or any third parties. . . .

2

> <u>Limitation on Direct Damages</u>. . . . with respect to all other claims, actions and causes of action arising out of, under or in connection with this Agreement . . . whether or not such damages are foreseen, neither Party's liability will exceed the total amount actually paid or payable to [Conifer] by Reid for Services provided under this Agreement . . . .

*Id.* at §§ 14.1(B), 14.1(C).

Conifer anticipated that it would initially lose money, but it hoped to start turning a profit after the second or third year as it earned bonuses under the Agreement. Dkt. 97-4 at 16–18 (Mason Dep. at 72–74). Conifer faced immediate difficulties: some of the employees inherited from Dell felt that the project was understaffed, dkt. 96-3 at 3, 6–7, 9, and under Conifer's management, some employees continued to feel understaffed and overworked, dkt. 97-14 at 45, 6-7. Conifer also had trouble collecting all of Reid's accounts receivable. Dkt. 97-4 at 81–82, 85–87 (Mason Dep. at 258–259, 267–269).

On September 9, 2013, Reid sent Conifer a letter regarding "Conifer's failure to meet certain minimum standards for performance under the [Agreement]." Dkt. 97-11. The letter said that the failure was "likely the result of Conifer's reduction of staff and the failure to perform all the base services delegated to Conifer under the [Agreement]." *Id.* Conifer responded by identifying how it would address each of the alleged deficiencies, including the staffing shortages. Dkt. 96-10.

Conifer lost $1.6 million on the Reid project in 2013 and by January 2014 was making plans to reduce expenses. Dkt. 97-9 at 39 (Land Dep. at 260); dkt. 97-23 at 10–11. That spring, Conifer believed that Reid was dissatisfied with its performance and that the Agreement was not profitable, so

it hoped to restructure the deal.  Dkt. 97-9 at 59–60 (Land Dep. at 645–646); dkt. 97-28.  In June 2014, Conifer proposed a "new deal" that would allow a "fresh start."  Dkt. 96-14.  In response, Reid terminated the Agreement.  Dkt. 97-30 at 11 (Knight Dep. at 94); dkt. 82-15.

Reid then sued Conifer, claiming breach of contract, breach of express warranty, and unjust enrichment, and seeking punitive damages.  Dkt. 8 at 26–32.  Conifer moved to dismiss Reid's claims for breach of warranty, unjust enrichment, and punitive damages, dkt. 26; and the Court granted that motion, dkt. 39.  Reid amended its complaint; alleging only that Conifer "willfully and with gross negligence" breached the Agreement.  Dkt. 42 ¶¶ 153–177.  Conifer has moved for summary judgment, arguing that Reid has failed to establish causation or damages.  Dkt. 79.  Reid opposes that motion and filed its own motion for partial summary judgment, arguing that Conifer breached the Agreement.  Dkt. 94.

## II.
## Applicable Law

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party must inform the court "of the basis for its motion" and specify evidence demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party meets this burden, the nonmoving party must "go beyond the pleadings" and identify "specific facts showing that there is a genuine issue for trial." Id. at 324.  In

ruling on a motion for summary judgment, the Court views the evidence "in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted).

In resolving the parties' claims, the Court interprets the Agreement under Indiana law.[1] "In applying Indiana contract law, the primary purpose is to ascertain and give effect to the intentions of the parties." *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 720 (7th Cir. 2004) (citing *Ft. Wayne Bank Bldg., Inc. v. Bank Bldg. & Equip. Corp. Of Am.*, 309 N.E.2d 464, 467 (Ind. Ct. App. 1974)). Courts must "read the agreement in a manner which harmonizes its provisions as a whole and to give effect to the parties' expressed intent." *Id.* If the contract is "clear in its terms and the intentions of the parties apparent, the court will require the parties to perform consistently with the bargain they made." *Id.* The Court must do its "best to predict how the Indiana Supreme Court would decide" the issues. *Webber v. Butner*, 923 F.3d 479, 482 (7th Cir. 2019).

### III.
### Analysis

"To prevail on a claim for breach of contract, the plaintiff must prove the existence of a contract, the defendant's breach of that contract, and damages resulting from the breach." *Haegert v. Univ. of Evansville*, 977 N.E.2d 924, 937 (Ind. 2012). The party alleging breach bears the burden of proving damages.

---

[1] The Agreement states that it "shall be governed according to the laws of Indiana without giving effect to any rule or conflicts of law." Dkt. 82-1 § 18.10.

5

*Belle City Amusements, Inc. v. Doorway Promotions, Inc.*, 936 N.E.2d 243, 249 (Ind. Ct. App. 2010). If "a plaintiff cannot establish damages . . . the defendant is entitled to judgment as a matter of law." *Shepard v. State Auto. Mut. Ins. Co.*, 463 F.3d 742, 748 (7th Cir. 2006).

Reid alleges that it is entitled to recover four categories of damages:

- **Net Revenue Not Collected**: Sums Conifer failed to collect based on a comparison of Conifer's performance with historical averages. Dkt. 95 at 41–47.

- **CDM Pricing and Charge Capture**: Sums resulting from Conifer underbilling patients. *Id.* at 49–51.

- **Length of Stay Damages**: Additional costs Reid incurred because the average length of stay per patient increased under Conifer's management. *Id.* at 47–49.

- **Outsourcing fees**: Amounts Reid paid to third-party vendors in an "effort to clean up Conifer's mess." *Id.* at 51.[2]

Conifer argues that the Agreement's limitations on damages bar liability for each category. *Id.* at 21–33. Reid responds that the limitations do not apply to these categories, and even if they did, it can recover because Conifer engaged in "willful misconduct." Dkt. 95 at 52–64.

---

[2] Reid also seeks prejudgment interest on its damages. Dkt. 95 at 64. Reid does not seek to recover fees that it paid to Conifer. *See id.* at 41–51; dkt. 82-15 at 3 ¶ 2.

### A. The Agreement's Limitations on Liability

The Agreement drastically limits the damages for which the parties could be liable:

> <u>Limitation on Types of Damages</u>. Except with respect to claims resulting from the willful misconduct of [Conifer or] its employees and agents . . . but with respect to all other claims, actions and causes of action arising out of, under or in connection with this Agreement . . . whether or not such damages are foreseen, neither Party will be liable for, any amounts for indirect, incidental, special, consequential (including without limitation lost profits, lost revenue, or damages for the loss of data) or punitive damages of the other Party or any third parties. . . .
>
> <u>Limitation on Direct Damages</u>. . . . with respect to all other claims, actions and causes of action arising out of, under or in connection with this Agreement . . . whether or not such damages are foreseen, neither Party's liability will exceed the total amount actually paid or payable to [Conifer] by Reid for Services provided under this Agreement . . . .

*Id.* at §§ 14.1(B), 14.1(C).

### B. Reid's Alleged Damages

#### 1. Lost Revenue: Net Revenue Not Collected and CDM Pricing and Charge Capture

Reid's first two categories of alleged damages—Net Revenue Not Collected and CDM Pricing and Charge Capture—seek damages for lost revenue. *See* dkt. 81-8; dkt. 95 at 60–61 (Reid admitting that both categories seek lost revenue). Conifer argues that Reid cannot recover these categories of damages because § 14.1(B) of the Agreement bars recovery for all lost revenue. Dkt. 116 at 15–16. Reid contends that § 14.1(B) bars the recovery of lost revenue only when it is a type of consequential damages, and that here, the lost revenue it seeks is instead a type of direct damages. Dkt. 95 at 62–63.

7

In the absence of a contrary contractual provision, Indiana law classifies lost-revenue or lost-profit damages sometimes as consequential damages and sometimes as direct damages. *ViaStar Energy, LLC v. Motorola, Inc.*, No. 1:05-CV-1095-DFH-WTL, 2006 WL 3075864, at *3 (S.D. Ind. Oct. 26, 2006) (citing *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning*, 746 N.E.2d 941 (Ind. 2001)). The difference "lies in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach." *Id.* (citing *Rexnord Corp. v. DeWolff Boberg & Assocs.*, 286 F.3d 1001, 1004 (7th Cir. 2002)).

Reid relies on that rule to argue that the lost-revenue damages it seeks were a foreseeable result of Conifer's breach, and therefore are recoverable under the Agreement as direct rather than consequential damages. *Id.* at 53–56 (relying on *ViaStar Energy*, 2006 WL 3075864 at *3). But that Indiana rule only governs in the absence of contrary contractual provisions; in other words, the parties to a contract may change what the common law would otherwise be. *Indiana v. Intl. Bus. Machines Corp.*, 51 N.E.3d 150, 160 (Ind. 2016) ("Applying the specific terms agreed to by the parties rather than the common law default rule is consistent with Indiana contract law principles. Indiana courts zealously defend the freedom to contract.").

Here, the relevant part of § 14.1(B) says that "whether or not such damages are foreseen," neither party can be liable for "consequential (including without limitation lost profits, lost revenue, or damages for the loss of data) . . . damages." This section of the Agreement thus does away with Indiana's

foreseeability distinction by saying that consequential damages, including lost revenue, are not recoverable regardless of whether they are foreseen.  Dkt. 82-1 § 14.1(B).  Dividing damages based on foreseeability would make the language "whether or not such damages are foreseen" meaningless, contrary to Indiana's interpretation principles.  See *Ryan v. TCI Architects/Engineers/Contractors, Inc.,* 72 N.E.3d 908, 914 (Ind. 2017) ("[A] contract should be construed so as to not render any words, phrases, or terms ineffective or meaningless.").

    Moreover, the Agreement provides no indication that lost revenue should be divided between direct and consequential damages.  Nor does it provide any rule that could be used to divide damages, having taken foreseeability off the table.  And Reid suggests no rule other than foreseeability.  *See* dkt. 95 at 60–63 (arguing only that the sought lost-revenue damages are direct because they were foreseeable).  In short, what Indiana law would otherwise split between direct and consequential damages based on foreseeability, the Agreement lumps into consequential damages.  So § 14.1(B)'s bar on the recovery of consequential damages stops Reid from recovering its alleged Net Revenue Not Collected and CDM Pricing and Charge Capture damages.

    Two other Agreement provisions bolster this conclusion.  First, § 14.1(A) says that the "Services provided . . . under this Agreement do not guarantee the collection of any accounts receivable."  Dkt. 82-1 at 27.  This confirms that the parties intended to strictly limit lost-revenue damages.  And second, while the limit on consequential damages expressly includes lost revenue, the provision allowing limited direct damages does not.  The sophisticated drafters of the

9

Agreement could easily have listed "lost revenue" as a type of direct damages that *could* be recovered—yet they chose to list it only as a type of consequential damages that *could not* be recovered.

In response, Reid relies on *Penncro Assocs., Inc. v. Sprint Spectrum, L.P.*, 499 F.3d 1151, 1156 (10th Cir. 2007) (Gorsuch, J.), a breach of contract case applying Kansas law. But *Penncro* does not support Reid's argument because the contract in *Penncro* did not change the default Kansas common-law rule that distinguished direct from consequential damages. *Id.* at 1156, 1156 n.6 (citing *Source Direct, Inc. v. Mantell*, 870 P.2 686, 693 (Kan. 1994)). While the outcome here is different, *Penncro* recognized the same freedom-to-contract principles that animate Indiana contract law and underpin today's decision. *Compare Penncro*, 499 F.3d at 1157 ("[P]arties to a contract are free to define their terms in any matter they wish. Up may be defined as down, right as left, day as night.") *with Intl. Bus. Machines Corp.*, 51 N.E.3d at 160 ("Indiana courts zealously defend the freedom to contract.").[3]

In sum—after the Court harmonizes the Agreement's provisions as it must, *see Hinc*, 382 F.3d at 720—the Agreement is best interpreted as classifying all lost revenue as consequential damages. And the Agreement generally bars liability for consequential damages. Dkt. 82-1 § 14.1(B). Reid therefore cannot show damages for Net Revenue Not Collected and CDM Pricing

---

[3] *Unilever United States, Inc. v. Johnson Controls, Inc.* also does not help Reid because the contract there did not explicitly include any lost profits in consequential damages and had no provisions altering the applicable New York law. No. 16-CV-01849, 2017 WL 622209, at *2–4 (N.D. Ill. Feb. 15, 2017).

and Charge Capture as required for its breach-of-contract claim. *Haegert*, 977 N.E.2d at 937.

### 2. Length of Stay Damages and Outsourcing Fees

Conifer argues that Reid's other two categories of damages—Length of Stay Damages and Outsourcing Fees—also seek consequential damages. Dkt. 80 at 29. For Length of Stay Damages, Conifer contends that because physicians make discharge decisions, any damages cannot be directly caused by a breach of the Agreement. *Id.* And for Outsourcing Fees, Conifer asserts that the costs for consultants hired after the Agreement was terminated cannot flow directly from any breach. *Id.* Reid responds that Length of Stay Damages are direct because the Agreement "spelled out specific obligations relating to [length of stay]." Dkt. 95 at 61. Reid did not respond to Conifer's argument on outsourcing fees. *See id.*

Consequential damages are "losses that do not flow directly and immediately from an injurious act but that result indirectly from the act." Black's Law Dictionary (11th ed.); *accord Elson v. Indianapolis*, 204 N.E.2d 857, 862 (Ind. 1965). Here, the Length of Stay Damages and Outsourcing Fees that Reid seeks both result indirectly from Conifer's alleged breach. The Length of Stay Damages are extra costs Reid incurred when patients' average length of stay increased from 3.63 days to 3.78 days under Conifer's management. Dkt. 95 at 47. But physicians ultimately decide when patients should be released, dkt. 81-1 at 4–5 (Cartwright Dep. at 22–23); and the Agreement never set a specific average length of stay, *see* dkt. 82-1 at Schedule C § 2(f). Reid's

citations to section 4 of the Agreement's Schedule A only underscore the indirect nature of Length of Stay Damages. *See* dkt. 97-3 at 41. That section merely sets out general tasks and evaluations that Conifer was responsible for, *id.*, and Reid does not explain how failing to perform them could cause the uptick in Reid's length-of-stay, *see* dkt. 95 at 61. Any damages from an increased average length of stay are thus an indirect result of Conifer's alleged breach, and therefore are consequential damages.

The Outsourcing Fees that Reid seeks are similarly indirect. Reid paid those fees to a third-party consultant to evaluate Conifer's performance under the Agreement, dkt. 82-23 at 9–10, and to another third party to bill and collect accounts after Reid terminated the Agreement, dkt. 82-17 at 18. But the Agreement does not contemplate third parties performing evaluations or taking over responsibilities after the Agreement's termination. These expenses therefore do not flow directly from Conifer's alleged breach, making them consequential damages too.

Reid therefore cannot show damages for Length of Stay Damages and Outsourcing Fees as required for its breach-of-contract claim. *Haegert*, 977 N.E.2d at 937.

### C. Willful Misconduct

The Agreement's limitation on liability for consequential damages has an exception for willful misconduct. Dkt. 82-1 at §§ 14.1(B), 14.1(C).[4] Reid relies

---

[4] The Agreement's limitation on direct damages also includes an exception for gross negligence. The Court does not address gross negligence because, as explained above,

on this exception, arguing that Conifer intentionally (1) failed to hire enough employees to do its work, (2) cut expenses to make a profit without considering the impact on Reid's revenue, and (3) failed to tell Reid about the extent of its struggles. Dkt. 95 at 56–64. Reid responds that Conifer's claims are unsupported by designated evidence. Dkt. 116 at 16–23.

The Agreement does not define willful misconduct, but under Indiana law it requires "something more than negligence." *Hershberger v. Booker*, 421 N.E.2d 672, 679 (Ind. Ct. App. 1981). Specifically, it is "an intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing wrongful acts with knowledge or appreciation of the likelihood of resulting injury." *Id.*

Reid's designated evidence shows that before Conifer took over the agreement, Dell suffered from staffing shortages that caused "problems associated with properly operating Reid's revenue cycle." Dkt. 96-2 at 3; *see* dkt. 97-40 at 98–108 (Hogan Dep. at 285–295). After Conifer took over, the shortages "became more severe." Dkt. 96-2 at 3; dkt. 97-52 (noting that a coding supervisor position wouldn't be filled "due to budget constraints"); dkt. 97-14 at 4–5. Conifer similarly cut expenses after taking over the Agreement. *See* dkt. 97-14 at 8; dkt. 97-45. But even if those were purposeful wrongful acts, Reid has not designated evidence tying those cuts to an intentional or

---

all of Reid's alleged damages are barred by the Agreement's limitation on consequential damages.

reckless failure to perform under the Agreement or showing "knowledge or appreciation of the likelihood of resulting injury," as required. *See Hershberger*, 421 N.E.2d at 679.

Reid contends that Conifer's cuts qualify because "Conifer's prime objective was subtraction; it mobilized a plan to cut expenses without any consideration for what that would mean for Reid's revenue cycle." Dkt. 95 at 68. Reid adds that concern about its "already struggling revenue cycle" was "noticeably absent" from Conifer's plans. Dkt. 95 at 69. But the designated evidence shows otherwise. Specifically, it shows only that Conifer was concerned about its profit and loss, had created a plan to turn the account positive, and hesitated to fill some positions or assign staff to Reid. *See, e.g.*, dkt. 974 at 11–18 (Mason Dep. at 66–74); dkt. 97-9 at 48 (Land Dep. at 576); dkt. 97-14 at 8, 10; dkt. 97-42; dkt. 97-43; dkt. 97-52. Reid has not designated evidence that Conifer did those things while disregarding Reid's interests.

Instead, Reid's own designated evidence shows Conifer's concern about Reid's revenue cycle. *See, e.g.,* dkt. 97-4 at 14 (Mason Dep. at 69) (explaining limits on expense cuts in order to maintain physician review services); dkt. 97-14 at 10 (identifying Conifer's "current performance with Reid" as a concern to be addressed); dkt. 97-23 at 3 (recognizing a "need [to] make drastic improvements"). Certainly Conifer's bottom line affected how it responded to those concerns. *See, e.g.,* dkt. 97-36 (explaining that while "under normal circumstance[s]" Conifer would add two coders, the "extra cost [would] make

14

the monthly reviews with finance very, very challenging"); dkt. 97-14 at 14. But those are common types of business concerns, and Reid's designated evidence does not connect them to any intentional or reckless failure to perform under the Agreement.

Reid also claims that Conifer should have kept Reid informed about revenue-cycle problems, citing an email chain among Conifer employees saying that an employee "should have raised a white flag" about workload problems. Dkt. 95 at 68 (quoting dkt. 97-40 at 3). But that email was about only one overburdened Conifer employee, and in context, is about Conifer's internal communication rather than communication between Conifer and Reid. *See* Dkt. 97-40 at 3–5.

In short, the designated evidence does not show that Conifer intentionally or recklessly failed to address problems in Reid's revenue cycle. Instead, Conifer was striving to perform its obligations under the Agreement. Conifer knew that it was losing more than $100,000 every month under the Agreement, but it still "had a commitment from [its] team . . . to continue to deliver services." Dkt. 114-4 at 75–76 (Mason Dep. at 114–115). And Conifer intended to meet its obligations while eventually making the Agreement profitable by both reducing expenses and performing well enough to earn incentive bonuses. *Id.* at 42, 68–69 (Mason Dep. at 73, 107–08). Therefore, a

reasonable factfinder could not find that Conifer committed willful misconduct under the Agreement.[5]

### IV.
### Conclusion

Conifer's motion for summary judgment is **GRANTED**. Dkt. [79]. Reid's motion for summary judgment, dkt. [94], is **DENIED** because even if Conifer breached the Agreement, Reid's claim still fails because no reasonable juror could find that Reid suffered any damages that are recoverable under the Agreement. The clerk **shall maintain this order under seal**.[6] Final judgment will issue by separate entry.

**SO ORDERED.**

Date: 4/8/2020

*James Patrick Hanlon*
James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

Kristen K. Bromberek
ALSTON & BIRD LLP
kristen.bromberek@alston.com

---

[5] Because none of Reid's alleged damages are recoverable under the Agreement's limitations on liability, the Court does not address Conifer's arguments that Reid cannot prove causation or that it suffered any damages.

[6] The Court has ordered that some of the documents in support of the parties' motions for summary judgment be kept under seal. Dkt. 98; dkt. 107; dkt. 110; dkt. 129; dkt. 130. Because this Order necessarily relies on those sealed documents, it too must be kept under seal.

Robert L. Burkart
ZIEMER STAYMAN WEITZEL & SHOULDERS
rburkart@zsws.com

William H. Jordan
ALSTON & BIRD LLP
bill.jordan@alston.com

Jacob M. O'Brien
STARR AUSTEN & MILLER LLP
obrien@starrausten.com

Mary Kaye Reeder
REID HOSPITAL & HEALTH CARE SERVICES, INC.
Mary.Reeder@reidhealth.org

Samuel R. Rutherford
ALSTON & BIRD LLP
sam.rutherford@alston.com

Patrick A. Shoulders
ZIEMER STAYMAN WEITZEL & SHOULDERS
pshoulders@zsws.com

Scott L. Starr
STARR AUSTEN & MILLER LLP
starr@starrausten.com